UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:

UNITED STATES OF AMERICA,

     Plaintiff,

     v.

STRATUS PHARMACEUTICALS, INC.
and SONAR PRODUCTS, INC.,
corporations, and ALBERTO HOYO, and
JUAN CARLOS
BILLOCH, individuals,

     Defendants.

## COMPLAINT FOR PERMANENT INJUNCTION

Plaintiff, the United States of America, by its undersigned attorneys, respectfully

represents to this Court as follows:

1.    This statutory injunction proceeding is brought under the Federal Food, Drug, and

Cosmetic Act (the "Act"), 21 U.S.C. § 332(a).

2.    The United States requests this Court permanently enjoin and restrain Stratus

Pharmaceuticals, Inc., Sonar Products, Inc., corporations, and Alberto Hoyo and Juan Carlos

Billoch, individuals, (hereinafter, collectively, "Defendants") from:

    A.    violating 21 U.S.C. § 331(d) by introducing or delivering for

introduction, or causing to be introduced or delivered for introduction, into interstate

commerce new drugs within the meaning of 21 U.S.C. § 321(p), that are neither approved

pursuant to 21 U.S.C. § 355, nor exempt from approval;

B.     violating 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce drugs that are misbranded within the meaning of 21 U.S.C. § 352(f)(1);

C.     violating 21 U.S.C. § 331(a) by introducing, delivering for introduction, or causing to be introduced or delivered for introduction into interstate commerce, drugs that are adulterated within the meaning of 21 U.S.C. § 351(a)(2)(B), in that the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current Good Manufacturing Practice ("cGMP") as set forth at 21 C.F.R. Part 211;

D.     violating 21 U.S.C. § 331(k) by causing drugs held for sale after shipment of one or more of their component parts in interstate commerce to become adulterated within the meaning of 21 U.S.C. § 351(a)(2)(B).

3.     The United States requests this Court permanently enjoin and restrain Defendants Sonar Products, Inc., corporation, and Alberto Hoyo, and Juan Carlos Billoch, individuals, from violating 21 U.S.C. § 331(k) by causing drugs held for sale after shipment of one or more of their component parts in interstate commerce to become misbranded within the meaning of 21 U.S.C. § 352(f)(1).

### JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter and all parties to this action pursuant to 21 U.S.C. § 332(a) and 28 U.S.C. §§ 1331 and 1345.

5.     Venue in this District is proper under 28 U.S.C. § 1391(b) and (c).

### DEFENDANTS AND THEIR PRODUCTS

6.     Defendant Stratus Pharmaceuticals, Inc. ("Stratus"), a Florida corporation, does business at 12379 SW 130th Street, Miami, Florida 33186 ("Stratus's facility") within the

jurisdiction of this Court.  Stratus distributes prescription and non-prescription drug products.
Stratus receives products in, and distributes products through, interstate commerce.

7.     Defendant Sonar Products, Inc. ("Sonar"), a New Jersey corporation, does
business at 609 Industrial Road, Carlstadt, New Jersey 07072 ("Sonar's facility").  Sonar is a
contract manufacturer of prescription and non-prescription drugs for other companies, including
Stratus.  Products manufactured, processed, packed, labeled, held, and distributed by Sonar are
shipped in interstate commerce, including to Stratus's facility.

8.     Among the products Defendant Sonar manufactures, processes, packs, labels,
holds, and distributes are Lidocaine 3% - Hydrocortisone 0.5% Cream Kit, Claris Clarifying
Wash, Sodium Sulfacetamide 9% and Sulfur 4.5%, Sodium Sulfacetamide 10% and Sulfur 2%
Cleanser, X-Viate 40% Gel, and X-Viate 40% Lotion (hereinafter "Identified Drugs").  Of the
Identified Drugs, Defendant Stratus processes, labels, holds, and distributes Claris Clarifying
Wash, X-Viate 40% Gel, and X-Viate 40% Lotion.

9.     Defendant Stratus owns eighty (80) percent of Defendant Sonar.

10.     Defendant Alberto Hoyo ("Hoyo") is the President of Defendant Stratus.  Hoyo is
responsible for, and has authority over, all operations at Stratus, including drug product
distribution and labeling, and has the authority and duty to prevent, detect, and correct
objectionable conditions at Stratus.  He performs his duties at Stratus's facility.

11.     Defendant Hoyo is a member of Defendant Sonar's board of directors.  During a
portion of 2015, Hoyo served as the President and CEO of Sonar and was identified during an
inspection by the Food and Drug Administration ("FDA") as the most responsible person for
Sonar.  Hoyo assists in overseeing Sonar's compliance with the Act.  Hoyo has the authority and
duty to prevent, detect, and correct objectionable conditions at Sonar.

12.     Defendant Juan Carlos Billoch ("Billoch") is Vice President of Operations of Defendant Stratus.  He is responsible for the day-to-day operations of Stratus, including regulatory affairs, labeling, and cGMP compliance, and has the authority and duty to prevent, detect, and correct objectionable conditions at Stratus.  He performs his duties at Stratus's facility.

13.     Defendant Billoch is a member of Sonar's board of directors.  Billoch assists in overseeing Sonar's compliance with the Act.  Billoch has the authority and duty to prevent, detect, and correct objectionable conditions at Sonar.

## DEFENDANTS' VIOLATIONS OF THE ACT

### Unapproved New Drugs

14.     A product is a drug within the meaning of the Act, *inter alia*, if it is "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man," 21 U.S.C. § 321(g)(1)(B), or if it is "intended to affect the structure or any function of the body of man," 21 U.S.C. § 321(g)(1)(C).

15.     The intended use of a product may be determined from any relevant source, including the product's labeling.  *See* 21 C.F.R. § 201.128.  The Act defines labeling as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."  21 U.S.C. § 321(m).

16.     Defendants introduce, deliver for introduction, or cause the introduction or delivery for introduction into interstate commerce of products that are drugs within the meaning of the Act because they are intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man and/or intended to affect the structure or any function of the body of man.

17.     Labeling on Defendant's Identified Drugs contain the following claims:

| Product | Claim(s) |
|---------|----------|
| Lidocaine 3% - Hydrocortisone 0.5% Cream Kit | • "is used for the anti-inflammatory and anesthetic relief of itching, pain, soreness and discomfort due to hemorrhoids, anal fissures, pruritus ani and similar conditions of the anal area." |
| Claris™ Clarifying Wash | • "is indicated in the topical control of acne vulgaris, acne rosacea and seborrheic dermatitis." |
| Sodium Sulfacetamide 9% and Sulfur 4.5% | • "is indicated for the topical control of acne vulgaris, acne rosacea and seborrheic dermatitis." |
| Sodium Sulfacetamide 10% and Sulfur 2% Cleanser | • "is indicated for use in the topical control of acne vulgaris, acne rosacea and seborrheic dermatitis." |
| X-Viate™ | • "For debridement and promotion of normal healing of hyperkeratotic surface lesions, particularly where healing is retarded by local infection, necrotic tissue, fibrinous or prurient [sic] debris or eschar."<br>• "Urea is useful for the treatment of hyperkeratotic conditions such as . . . psoriasis, xerosis, ichthyosis, eczema, keratosis, keratoderma . . ." |

18.     Defendant Sonar manufactures, processes, packs, labels, holds, and distributes other products that are intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man, and/or intended to affect the structure or any function of the body of man.

19.     Defendant Stratus processes, labels, holds, and distributes other products that are intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man and/or intended to affect the structure or any function of the body of man.

20.     A "new drug" is defined as any drug "the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof . . . ; or any drug . . . the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions."  21 U.S.C. § 321(p).

21.     A "new drug" may not be introduced or delivered for introduction into interstate commerce unless FDA has approved a new drug application ("NDA") or an abbreviated new drug application ("ANDA") with respect to such drug, or such drug is exempt from approval.  21 U.S.C. §§ 331(d) and 355.  A drug may be exempt from the Act's new drug approval requirement, 21 U.S.C. §355(a), if it is the subject of an investigational new drug application ("IND").  *See* 21 U.S.C. §355(i).  It is a violation of the Act to introduce or deliver for introduction, or cause to be introduced or delivered for introduction, into interstate commerce a new drug that is neither approved nor exempt from approval.  21 U.S.C. § 331(d).

22.     The Identified Drugs are "new drugs" within the meaning of the Act, *inter alia*, because they are not generally recognized among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling.  21 U.S.C. § 321(p)(1).

23.     There is no approved NDA, ANDA, or IND on file with FDA for the Identified Drugs.  Accordingly, the Identified Drugs are unapproved new drugs.

24.     Defendant Sonar manufactures, processes, packs, labels, holds, and distributes other products that are new drugs that are neither approved nor exempt from approval, and, thus, are unapproved new drugs.

25.     Defendant Stratus processes, labels, holds, and distributes other products that are new drugs that are neither approved nor exempt from approval, and, thus, are unapproved new drugs.

26.     Defendants' introduction or delivery for introduction, or causing the introduction or delivery for introduction of the Identified Drugs and other unapproved new drugs into interstate commerce violates 21 U.S.C. § 331(d).

**Misbranded Drugs**

***Defendants are violating 21 U.S.C. § 331(a)***

27.     The introduction or delivery for introduction, or causing the introduction or delivery for introduction, into interstate commerce of any drug that is misbranded violates the Act.  21 U.S.C. § 331(a).

28.     A drug is misbranded if its labeling fails to bear "adequate directions for use," and it does not fall within a regulatory exemption from this requirement.  21 U.S.C. § 352(f)(1); 21 C.F.R. Part 201, Subpart D.

29.     Under 21 C.F.R. § 201.5(a), "adequate directions for use" are defined as "directions under which the layman can use a drug safely and for the purpose for which it is intended."

30.     Defendant Sonar manufactures, processes, packs, labels, holds, and distributes drugs for which it is impossible to write adequate directions for use because such directions—

including indications, contraindications, dosages, routes of administration, warnings, side effects, and necessary collateral measures—must be premised on animal and clinical data derived from extensive, scientifically controlled testing, and there is no well-controlled clinical test data for the Identified Drugs.

31.     Defendant Stratus processes, labels, holds, and distributes drugs for which it is impossible to write adequate directions for use because such directions—including indications, contraindications, dosages, routes of administration, warnings, side effects, and necessary collateral measures—must be premised on animal and clinical data derived from extensive, scientifically controlled testing, and there is no well-controlled clinical test data for the Identified Drugs.

32.     The Identified Drugs are not exempt from the "adequate directions for use" requirement under 21 C.F.R. §§ 201.100 or 201.115.

33.     A new drug is exempt from the adequate directions for use requirement if it bears the precise labeling approved in its approved application.  *See* 21 C.F.R. § 201.115.  Moreover, a prescription drug that is a new drug can qualify for the exemption from the adequate directions for use requirement if its labeling bears the information authorized by an approved new drug application.  *See* 21 C.F.R. § 201.100(c)(2).  New drugs that lack an approved NDA or ANDA cannot qualify for either of these exemptions and therefore are misbranded as a matter of law.

34.     The Identified Drugs are prescription drugs and lack an approved NDA or ANDA and, thus, are not exempt from the adequate directions for use requirement and are misbranded.

35.     Defendant Sonar manufactures, processes, packs, labels, holds, and distributes other drug products that are misbranded.

36.     Defendant Stratus processes, labels, holds, and distributes other drug products that

are misbranded.

37. Defendants violate the Act, 21 U.S.C. § 331(a), by introducing or delivering for introduction, or causing the introduction or delivery for introduction, into interstate commerce articles of drug, as defined by 21 U.S.C. § 321(g)(1), that are misbranded within the meaning of 21 U.S.C. § 352(f)(1), as set forth above.

### Defendants Sonar, Hoyo, and Billoch are violating 21 U.S.C. § 331(k)

38. The doing of any act with respect to a drug that renders it misbranded while such article is held for sale after shipment of one or more of its components in interstate commerce violates the Act. 21 U.S.C. § 331(k).

39. Sulfur was shipped from New York to Defendant Sonar in 2014, and was then used to manufacture two of the Identified Products, Claris Clarifying Wash and Sodium Sulfacetamide 9% and Sulfur 4.5%.

40. Ingredients for other drug products manufactured, processed, packed, labeled, held, and distributed by Defendant Sonar are shipped in interstate commerce to Sonar's facility.

41. Defendants Sonar, Hoyo, and Billoch violate the Act, 21 U.S.C. § 331(k), by causing articles of drug, as defined by 21 U.S.C. § 321(g)(1), to become misbranded, within the meaning of 21 U.S.C. § 352(f)(1), while such drugs are held for sale after shipment of one or more of their components in interstate commerce.

## Adulterated Drugs

### *Defendants are violating 21 U.S.C. § 331(a)*

42.     The introduction or delivery for introduction, or causing the introduction or delivery for introduction, into interstate commerce of any drug that is adulterated violates the Act.  21 U.S.C. § 331(a).

43.     The Act requires facilities in which drug products are manufactured, processed, packed, or held operate in compliance with the cGMP requirements for drugs, 21 U.S.C. § 351(a)(2)(B), to ensure that drugs meet the requirements of the Act as to safety, and have the identity and strength and meet the quality and purity characteristics that they purport to or are represented to possess.  Drugs not manufactured, processed, packed, or held in conformance with cGMP are deemed adulterated as a matter of law, without any showing of actual defect.  The cGMP regulations, set forth at 21 C.F.R. Parts 210 and 211, establish the minimum cGMP requirements applicable to human drugs, and require control over all aspects of the processes and procedures by which drugs are manufactured, processed, packed, or held to prevent the production of unsafe and ineffective products.

44.     Four FDA inspections at Defendant Sonar's facility and Defendant Stratus's facility since March 2014 have established that the methods, facilities, and controls Defendants use for manufacturing, processing, packing, or holding drugs do not conform to cGMP requirements and therefore, Defendants' drugs are adulterated within the meaning of 21 U.S.C. § 351(a)(2)(B).

45.     FDA inspected Defendant Stratus's facility between November 18, 2014 and December 8, 2014 ("FDA's December 2014 inspection at Stratus").  That inspection documented cGMP deficiencies with respect to Stratus's quality unit failing to approve or reject drug products manufactured, processed, packed, or held under contract by another company, which

included the failure to review batch production records to assure no errors have occurred and to fully investigate any unexplained batch discrepancies or complaints, in violation of 21 C.F.R. § 211.22(a).

46.   Defendant Stratus does not have the proper controls in place or possess adequate quality oversight to assure that drug products manufactured by Defendant Sonar conform to cGMP requirements and that finished drug products meet established specifications for identity, strength, quality, and purity prior to release, in violation of 21 C.F.R. § 211.22(c).

47.   Defendant Stratus also failed to properly handle 1,362 complaints from 2013 to 2014, in violation of 21 C.F.R. § 211.198.

48.   During an inspection conducted at Defendant Sonar's facility between March 12 and April 2, 2015 ("FDA's April 2015 inspection at Sonar"), as well as during inspections between October 6 and November 12, 2014 ("FDA's November 2014 inspection at Sonar") and between February 6 and March 18, 2014 ("FDA's March 2014 inspection at Sonar"), FDA documented deviations from the drug cGMP regulations, including but not limited to:

a.   Sonar failed to reject drug products that did not meet established standards or specifications, as required by 21 C.F.R. § 211.165(f).  Specifically, Sonar knew that some products were exceeding microbial limits and contained objectionable microorganisms, but did not thoroughly investigate, and instead released the products to the market.

b.   Sonar used water in manufacturing that failed microbial limits for ingredients, as required by 21 C.F.R. § 211.84(a).  Specifically, Sonar found excessive microbes in the water from Sonar's purified water system, which led to multiple microbial test failures.  Instead of conducting a

thorough investigation of the contamination and isolating the source, Sonar released products made with the contaminated water. Approximately 15 batches were produced that contained the contaminated water as a raw material or were manufactured on equipment cleaned with the contaminated water, and nearly all of those batches were released. Sonar's failure to conduct a thorough investigation of the failed water results violated 21 C.F.R. § 211.192.

c.      Sonar failed to establish and follow written procedures for cleaning and maintaining equipment.  Specifically, equipment used to manufacture drug products was not appropriately cleaned, maintained, or sanitized to prevent possible contamination that would alter the safety, identity, strength, quality, or purity of the product.  21 C.F.R. § 211.67(b). Samples taken to verify the effectiveness of Sonar's cleaning showed excessive microbial levels found to be Too Numerous to Count ("TNTC") after equipment was re-cleaned and sanitized.  Sixty-nine lots of finished drug products were manufactured while Sonar was experiencing cleaning failures.

d.      Sonar failed to have appropriate laboratory testing of each batch of drug product required to be free of objectionable microorganisms, as required by 21 C.F.R. § 211.165(b).  Specifically, Sonar released to customers several lots of antacid/anti-gas products that failed antimicrobial preservative effectiveness testing, instead of thoroughly investigating and extending the investigation to other product lots as required by 21 C.F.R.

§ 211.192.  Additionally, Sonar failed to confirm the adequacy of the microbial testing methods used by the Sonar's contract laboratories for approximately 46 products.

e.  Sonar failed to establish scientifically sound and appropriate specifications, standards, and test procedures to assure that their drug products met raw material and finished product specifications and that the testing methods employed were scientifically supportable as required by 21 C.F.R. § 211.160(b).  Specifically, Sonar's test methods were not written in sufficient detail to assure their adequacy for testing of raw materials and finished drug product.  Sonar's out-of-specification ("OOS") procedure is inadequate.  FDA found multiple examples where OOS results were not investigated and a second set of samples were submitted for testing in order to replace the original failing results.  The original failing results were not reported or investigated further.

49.  FDA's inspections of Defendants' facilities establish that drugs manufactured at and distributed from Defendant Sonar's facility and distributed from Defendant Stratus's facility are adulterated within the meaning of 21 U.S.C. § 351(a)(2)(B), in that the methods used in, and the facilities and controls used for their manufacture, processing, packing, or holding do not conform to and are not operated or administered in conformity with cGMP requirements.

50.  During FDA's December 2014 inspection at Stratus, FDA documented the presence of adulterated drug products, including but not limited to the Identified Drugs.

51.  Defendants violate 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing the introduction or delivery for introduction, into interstate commerce

articles of drug, as defined by 21 U.S.C. § 321(g)(1), that are adulterated within the meaning of 21 U.S.C. § 351(a)(2)(B).

### *Defendants are violating 21 U.S.C. § 331(k)*

52.     The doing of any act with respect to a drug that renders it adulterated while such article is held for sale after shipment of one or more of its components in interstate commerce violates the Act.  21 U.S.C. § 331(k).

53.     Ingredients used to manufacture some of the Identified Drugs and other products manufactured or distributed by Defendants are shipped in interstate commerce to Defendant Sonar's facility.

54.     After those ingredients are shipped in interstate commerce, they pass through Defendant Sonar's facility, which, as discussed above, did not conform to cGMP regulations, resulting in the drug products being adulterated.

55.     Drug products distributed from Defendant Stratus's facility are adulterated within the meaning of 21 U.S.C. § 351(a)(2)(B), in that the methods used in, and the facilities and controls used for their processing, packing, or holding do not conform to and are not operated or administered in conformity with cGMP regulations, resulting in further adulteration.

56.     Defendants violate 21 U.S.C. § 331(k) by causing the adulteration, within the meaning of 21 U.S.C. § 351(a)(2)(B), of articles of drug, as defined by 21 U.S.C. § 321(g)(1) while such articles are held for sale after shipment in interstate commerce.

### **Interstate Commerce**

57.     FDA documented shipments that constitute the introduction or delivery for introduction of unapproved new drugs, misbranded drugs, and adulterated drugs into interstate commerce under 21 U.S.C. § 331(a) and (d).

    a.     During an investigation by FDA at Stratus's facility from November 23-

24, 2015 ("FDA's November 2015 investigation at Stratus"), FDA

documented the shipment of Claris Clarifying Wash, X-Viate 40% Gel,

from Sonar's facility in New Jersey to Stratus's facility in Florida.

b.     During FDA's December 2014 inspection at Stratus, FDA documented the

shipment of products from Stratus's facility in Florida to customers

located outside of Florida, including X-Viate to a firm in Pennsylvania and

Claris Clarifying Wash to a firm in Ohio.

c.     During FDA's November 2014 inspection at Sonar, FDA documented the

shipment of products from Sonar's facility in New Jersey to customers

located outside of New Jersey, including Lidocaine 3% - Hydrocortisone

0.5% Cream Kit to a firm in Indiana, Sodium Sulfacetamide 10% and

Sulphur 2% Cleanser to a firm in Texas, and X-Viate 40% Lotion to a firm

in Florida.

d.     During FDA's March 2014 inspection at Sonar, FDA documented Sonar's

shipment of Sodium Sulfacetamide 9% and Sulphur 4.5% from Sonar's

facility in New Jersey to a firm in New York.

58.     During FDA's March 2014 and November 2014 inspections at Sonar, FDA

documented the shipment of Sulfur from New York to Sonar in New Jersey.  That Sulfur was

used to manufacture two Identified Drugs, Claris Clarifying Wash and Sodium Sulfacetamide

9% and Sulfur 4.5%.

## HISTORY AND NOTICE

59.     Defendants are aware that their conduct violates the law and that continued

violations could lead to regulatory action.

## Notice of Unapproved Drug and Misbranding Violations

60.     During FDA's March 2014 inspection at Sonar, Defendant Sonar's former president acknowledged to FDA that drug products manufactured by Sonar are unapproved drug products.

61.     During FDA's November 2014 inspection at Sonar, FDA discussed with Defendant Sonar's former president that the company was manufacturing unapproved products and warned him that future enforcement action, including injunctive relief, was possible if the company continued to fail to comply with the law.  FDA also made the company aware of FDA's Marketed Unapproved Drugs Compliance Policy Guide, Sec. 440.100 ("CPG Section 440.100"), dated September 19, 2011.

62.     During FDA's December 2014 inspection at Stratus, FDA discussed the unapproved status of Defendants' drugs with Defendants Hoyo and Billoch and warned them that future enforcement action, including injunctive relief, was possible if the company continued to fail to comply with the law.  FDA also made them aware of CPG Section 440.100.

63.     On April 13, 2015, pursuant to 21 U.S.C. § 334, the United States seized unapproved and misbranded drugs held at Defendant Stratus's facility and manufactured by Defendant Sonar.  Stratus and Sonar received formal notice of this seizure on April 13, 2015 and May 18, 2015, respectively.  Products seized included Claris Clarifying Wash, X-Viate 40% Gel, and X-Viate 40% Lotion.  On October 28, 2015, the United States District Court for the Southern District of Florida issued a default judgment finding these drugs to be unapproved new drugs and misbranded.

64.     During FDA's November 2015 investigation at Stratus, FDA told Defendants Hoyo and Billoch of the unapproved status of a number of Defendants' products and Hoyo stated he remembered FDA previously raised that issue in 2014.

65.    To date, despite being warned of possible regulatory action, Defendants have not filed an NDA, ANDA, or IND for their unapproved new drugs.

## Notice of Adulteration Violations

66.    Further, Defendants' noncompliance has continued despite notification from FDA of their cGMP violations.  At the conclusion of each FDA inspection, FDA issued a detailed List of Inspectional Observations to the following persons and discussed those inspectional findings with these persons:

a.    FDA's March 2014 inspection at Sonar ending March 18, 2014, to Defendant Sonar's former Director of Regulatory Affairs and the former Director of Quality Assurance;

b.    FDA's November 2014 inspection at Sonar ending December 12, 2014, to Defendant Sonar's then president and current president;

c.    FDA's December 2014 inspection at Stratus ending December 8, 2014, to Defendants Hoyo and Billoch; and

d.    FDA's April 2015 inspection at Sonar ending April 2, 2015, to Defendant Sonar's then president and current president.

67.    Defendant Sonar responded in writing to the List of Inspectional Observations from each inspection occurring at Sonar's facility.  The responses attempted to justify each failure of their procedures, promised improvements, and submitted information purporting to show corrective action had been taken.  Despite those promised corrective actions, however, deficiencies persist at Sonar's facility.

68.    Defendant Stratus, through Defendant Hoyo, responded to the List of Inspectional Observations arising from FDA's December 2014 inspection at Stratus.

69.    Defendant Stratus responded in writing to the List of Inspectional Observations

for the inspection occurring at Stratus's facility.  The responses attempted to justify each failure of their procedures, promised improvements, and submitted information purporting to show corrective action had been taken.

70.     Significant cGMP violations identified both at Defendant Sonar's facility and at Defendant Stratus's facility, the contract manufacturer for Defendant Stratus, and the interconnected ownership between the two companies demonstrate a combined failure to achieve and sustain cGMP compliance.  The documented violations demonstrate a lack of quality oversight of the manufacturing, processing, and testing of human drugs such that continued production of drug products poses a threat to the public health.

71.     Defendant Stratus has failed to fully correct the cGMP issues identified at Stratus's facility.  This failure demonstrates a lack of quality oversight of the manufacturing, processing, and testing of human drugs such that continued distribution of drug products poses a threat to the public health.

72.     Additionally, product issues identified outside of FDA inspections, as detailed in paragraphs 74-77 below, further alerted Defendants that their compliance with cGMP regulations was insufficient.

73.     In 2013, Defendant Stratus purchased a company that sold over-the-counter antacid products to a major national pharmacy company.  After that purchase, Defendant Sonar began producing the antacid products.

74.     On February 6, 2015, an antacid manufactured by Defendant Sonar was recalled for microbial contamination with *Psuedomonas aeruginosa* and/or *Citrobacter freundii*.

75.     On April 4, 2015, three antacid products manufactured by Defendant Sonar were recalled for microbial contamination with *Psuedomonas aeruginosa*, *Escherichia coli*, and

*Staphylococcus aureus.*

76.     On April 22, 2015, another pharmaceutical company using Defendant Sonar as a contract manufacturer recalled Sodium Sulfacetamide 9% and Sulfur 4.5% Wash manufactured by Sonar because of microbial contamination with *Ralstonia mannitollytica* and failing preservative testing.

77.     On December 6, 2014, another pharmaceutical company using Defendant Sonar as a contract manufacturer recalled a pediatric product manufactured by Sonar because it contained red dye #40 even though the product was labeled as "dye-free."

## CONCLUSION

78.     As there is no indication that Defendants have ceased manufacturing or distributing their unapproved new, adulterated, and misbranded drugs, or adequately corrected the cGMP violations, violations of the Act will continue in the absence of an injunction.

79.     Unless restrained by this Court, Defendants will continue to violate the Act, 21 U.S.C. § 331(a), (d), and (k).

WHEREFORE, the United States respectfully requests that the Court:

I.     Permanently restrain and enjoin, under 21 U.S.C. § 332(a), Defendants, and each and all of their directors, officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all persons in active concert or participation with any of them, from doing or causing to be done any of the following acts:

A.     violating 21 U.S.C. § 331(d) by introducing or delivering, or causing to be introduced or delivered, into interstate commerce unapproved new drugs;

B.     violating 21 U.S.C. § 331(a) by introducing or delivering, or causing to be introduced or delivered, into interstate commerce drugs that are misbranded within the meaning of 21 U.S.C. § 352(f)(1);

C.      violating 21 U.S.C. § 331(a) by introducing or delivering, or causing to be introduced or delivered, into interstate commerce drugs that are adulterated within the meaning of 21 U.S.C. § (a)(2)(B); and

D.      violating 21 U.S.C. § 331(k) by causing drugs held for sale after shipment of one or more of their components in interstate commerce to become adulterated within the meaning of 21 U.S.C. § 351(a)(2)(B).

II.      Permanently restrain and enjoin, under 21 U.S.C. § 332(a), Defendants Sonar, Hoyo, and Billoch, and each and all of their directors, officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all persons in active concert or participation with any of them, from doing or causing to be done the following act:  Violating 21 U.S.C. § 331(k) by causing drugs held for sale after shipment of one or more of their components in interstate commerce to be misbranded within the meaning of 21 U.S.C. § 352(f)(1).

III.      Permanently restrain and enjoin, under 21 U.S.C. § 332(a), Defendants, and each and all of their directors, officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all persons in active concert or participation with any of them, from directly or indirectly introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce any drug, including but not limited to Lidocaine 3% - Hydrocortisone 0.5% Cream Kit, Claris Clarifying Wash, Sodium Sulfacetamide 10% and Sulfur 2% Cleanser, Sodium Sulfacetamide 9% and Sulfur 4.5%, X-Viate 40% Gel, and X-Viate 40% Lotion, and any product labeled similarly to such products and containing the same active ingredients, unless and until an approved new drug application, an abbreviated new drug application, or an investigational new drug application filed by Defendants pursuant to 21 U.S.C. § 355(b), (j), or (i) is in effect for such drugs.

IV.     Order that Defendants destroy, under FDA's supervision and at Defendants'
expense, all Lidocaine 3% - Hydrocortisone 0.5% Cream Kit, Claris Clarifying Wash, Sodium
Sulfacetamide 10% and Sulfur 2% Cleanser, Sodium Sulfacetamide 9% and Sulfur 4.5%, X-
Viate 40% Gel, and X-Viate 40% Lotion, and any product labeled similarly to such products and
containing the same active ingredient(s), within expiry, in their custody, control, or possession,
and that the costs of FDA's supervision be borne by Defendants at the rates prevailing at the time
the destruction is accomplished.

V.     Order that FDA be authorized to inspect Defendants' facilities and all records
relating to the receipt, manufacture, processing, packing, labeling, holding, and distribution of
any of Defendants' drug products to ensure continuing compliance with the terms of the
injunction, the costs of such inspections to be borne by Defendants at the rates prevailing at the
time the inspections are accomplished.

VI.     Order that Plaintiff be granted judgment for its costs herein, and that this Court

grant such other and further relief as it deems just and proper.

DATED this 3rd day of May, 2017.

Respectfully submitted,

Of Counsel:

JEFFREY S. DAVIS
Acting General Counsel
United States Department of
   Health & Human Services

ELIZABETH H. DICKINSON
Chief Counsel
Food and Drug Administration

PERHAM GORJI
Deputy Chief Counsel, Litigation

JOSHUA A. DAVENPORT
Associate Chief Counsel for Enforcement
United States Department of
   Health & Human Services
Office of the General Counsel
Food and Drug Division
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002
Tel.:  (301) 796-6717
Fax:  (301) 847-8638
joshua.davenport@fda.hhs.gov

BENJAMIN G. GREENBERG
Acting United States Attorney
Southern District of Florida

JAMES A. WEINKLE
Florida Bar No.: 0710891
Assistant United States Attorney
99 N.E. 4th Street, Suite 300
Miami, Florida 33132
Tel.:  (305) 961-9290
James.Weinkle@usdoj.gov

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

MICHAEL S. BLUME
Director
Consumer Protection Branch

 /s/ Monica C. Groat_____
MONICA C. GROAT
JACQUELINE BLAESI-FREED
Trial Attorney
Consumer Protection Branch
United States Department of Justice
P.O. Box 386
Washington, DC  20044
Tel.:  (202) 532-4218
Fax:  (202) 514-8742
Monica.C.Groat@usdoj.gov